IN THE MATTER OF THE APPLICATION OF GREENVILLE BUS COMPANY FOR APPROVAL OF MUNICIPAL CONSENT OF THE CITY OF JERSEY CITY, FOR THE OPERATION OF TEN (10) AUTOBUSES ON A NEW ROUTE, TO BE KNOWN AS THE GREENVILLE-JOURNAL SQUARE BUS ROUTE (P.U.C. ROUTE FILE No. 407-171).

HENRY HOHORST, Jr., AND HOHORST, INC.; GRASSO BROS., INC., AND 47 OTHERS, THE OWNERS AND OPERATORS OF MOTOR BUSES ON THE CENTRAL AND BERGEN AVENUE BUS ROUTES IN JERSEY CITY, APPELLANTS, v. GREENVILLE BUS COMPANY, DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, PUBLIC SERVICE COORDINATED TRANSPORT, CITY OF JERSEY CITY AND THE ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, RESPONDENTS.

Argued November 15 and 22, 1954—Decided December 20, 1954.

132

Mr. *Thomas J. Armstrong* argued the cause for the appellants (*Messrs. Armstrong & Mullen*, attorneys).

Mr. *James F. X. O'Brien* argued the cause for the respondent Greenville Bus Company.

The opinion of the court was delivered by

JACOBS, J.   The Board of Public Utility Commissioners approved municipal consent for the operation of six auto-buses by the respondent Greenville Bus Company along a route in Jersey City which may roughly be described as running from Greenville to Journal Square via Ocean Avenue.   The appellants Bergen Avenue Bus Owners, as bus operators along a route from Greenville to Journal Square via Bergen Avenue, and the appellants Central Avenue Bus Owners, as bus operators along a route from Greenville to Journal Square via Garfield Avenue, duly filed notice of appeal to the Appellate Division.   Their appeal has been certified to this court under *R. R.* 1:10–1(*a*).

The Greenville section of Jersey City is located at its southerly end near the City of Bayonne.   Journal Square is located towards the northerly end of Jersey City and may be described as its most important business, entertainment and transportation center.   The principal thoroughfares in the city, listed from west to east, are West Side Avenue, Hudson Boulevard, Bergen Avenue, Jackson Avenue, Ocean Avenue and Garfield Avenue.   All of these thoroughfares except Ocean Avenue have bus service carrying passengers to Journal Square without transfer and on a single fare. The Ocean Avenue bus lines, however, run to Grove Street and Exchange Place, rather than Journal Square; passengers going to Journal Square must transfer to other buses at the Communipaw Avenue Junction and must pay second fares.   Most Ocean Avenue passengers who wish to reach Journal Square on a single fare and without transfer are required to walk east to Garfield Avenue, or west to Jackson Avenue or beyond Jackson Avenue to Bergen Avenue.   And the same may be said if their destination is the important Jersey City Medical Center which is located about a mile from Journal Square.

The present Ocean Avenue bus lines are being oper-ated by the Public Service Coordinated Transport and by the respondent Greenville Bus Company and its stockholders

who individually own and operate 30 buses. The Greenville Bus Company is itself authorized to run ten buses to Grove Street and Exchange Place, and although it has reduced the extent of its operations the public needs along the Ocean Avenue route to Grove Street and Exchange Place have still been fully met by it along with its individual stockholders and the Public Service Coordinated Transport. In 1951 the Greenville Bus Company sought and obtained permission from the City of Jersey City to operate ten buses along a route from Greenville to Journal Square via Ocean Avenue. The municipal resolution embodying the city's consent set forth that the company's application was to extend its operations so as to provide direct transportation from the Greenville section to the Medical Center and Journal Square for a single fare; that no direct route was presently available; and that the company's proposed route would provide "direct transportation and meet the necessity and convenience of Jersey City residents." Thereafter the company applied to the Board of Public Utility Commissioners for approval of the city's consent to the operation of ten buses along the proposed route from Greenville to Journal Square via Ocean Avenue. The pertinent statute (*R. S.* 48:2–14) provides that the "approval shall be given when, after hearing, the board determines that the privilege or franchise is necessary and proper for the public convenience and properly conserves the public interests." Although the statutory standard is general in nature, it is sufficient to guide the board and satisfy constitutional requirements. See *Hohorst v. Marion Bus Transp. Co., Inc.*, 5 *N. J. Super.* 279, 281 (*App. Div.* 1949). *Cf. Family Finance Corp. v. Gaffney*, 11 *N. J.* 565, 575 (1953); *Ward v. Scott*, 11 *N. J.* 117, 124 (1952); *N. J. Bell Tel. Co. v. Communications Workers, etc.*, 5 *N. J.* 354, 371 (1950).

Hearings on the company's application were held by the board on 20 days; over 2,000 pages of testimony were taken and many exhibits were introduced in evidence. More than 50 witnesses testified in support of the application; these

included 45 public witnesses who were interested in the transportation facilities along Ocean Avenue, Mr. Massoth, whose qualifications as a transportation and traffic consultant were conceded, Mr. Schulman who was then vice-president of the Journal Square Businessmen's Association and chairman of its Committee on Transportation and Sales Promotions, and other individual witnesses. In opposition to the application, various witnesses were produced by the Public Service Coordinated Transport and the Central Avenue and Bergen Avenue Bus Owners. These included Mr. Cone, a Public Service Coordinated Transport traffic engineer, whose qualifications were conceded, Mr. Judge, a transportation consultant, various representatives and employees of the Greenville Bus Company and the Central Avenue and Bergen Avenue Bus Owners, and other individual witnesses. The hearings were conducted with ample opportunity for the examination and cross-examination of witnesses and the introduction of documentary evidence into the record. *Cf. Abbotts Dairies, Inc. v. Armstrong,* 14 *N. J.* 319, 332 (1954); *Pennsylvania Railroad Co. v. Department of Public Utilities,* 14 *N. J.* 411, 426 (1954). After their conclusion the board filed its written decision, determination and opinion which approved the application. In its decision it set forth the testimony in support of the application; it referred to the adverse testimony of Mr. Cone as being based largely "on assumptions and mathematical calculations on these" and expressed the view that it "was not as convincing as that of the public witnesses who appeared in person in support of the application"; and it rejected testimony by Mr. Judge based on dispatch sheets which had been prepared in advance and which contained numerous erasures and corrections which "were never satisfactorily explained." It expressly found and determined from the evidence that (1) public convenience and necessity required the additional service; (2) the objectors had failed to show that additional substantial competition would result from approval of the application; (3) the operation of six of the ten buses as author-

ized by the municipal consent on the proposed route was "necessary and proper for public convenience and that said consent properly protected the public interest"; and it therefore granted approval of the municipal consent for the operation of six buses, subject to the restriction and condition outlined in the schedule annexed to the decision. *Cf. Atlantic City Transp. Co. v. Director, Div. of Taxation,* 12 *N. J.* 130, 139 (1953); *In re Central Railroad Co. of N. J.,* 29 *N. J. Super.* 32, 39 *(App. Div.* 1953). Public Service Coordinated Transport, as the operator of bus lines along Ocean and Jackson Avenues, did not appeal from the board's determination; however, the appeal before us was taken and is pressed by the Central and Bergen Avenue Bus Owners who contend in effect: (1) that the existing service was adequate and no public need for additional service was shown; (2) that any substantial revenues obtainable by the applicant must come from them and the Public Service Coordinated Transport and there was no showing of ability by the applicant to operate without impairing the existing service; (3) that the applicant had not established its financial ability to operate successfully; (4) that any interference with the appellants' property rights in their routes would be in "violation of the due process clauses of the State and Federal Constitutions" and, (5) that the findings by the board were insufficient to sustain its action.

In passing upon the appellants' contentions we must ever bear in mind that ours is not the function of making original factual findings and policy determinations as to whether the operation of the new bus line is necessary and proper for the public convenience and will properly serve the public interest. That function has been appropriately vested by the Legislature in the Board of Public Utility Commissioners which applies its experienced administrative judgment to the subject at hand. Its determination carries with it the presumption of correctness *(In re New Jersey Power & Light Co.,* 9 *N. J.* 498, 508 (1952)), and on judicial review the court will not substitute its independent judgment for that

of the board but will confine its inquiry to the ascertainment of whether the evidence before the board furnished a reasonable basis for its action. See *Rahway Valley Railroad Co. v. Board of Public Utility Com'rs.*, 127 *N. J. L.* 164, 167 (*Sup. Ct.* 1941); *New Jersey Power & Light Co. v. Borough of Butler*, 4 *N. J. Super.* 270, 279 (*App. Div.* 1949). *Cf. New Jersey Bell Tel. Co. v. Communications Workers, etc., supra,* 5 *N. J.* at *page* 377; *R. S.* 48:2–46; *R. R.* 4:88–13.

Mr. Schulman testified that there was no shopping area at Exchange Place; that Grove Street and Newark Avenue had a shopping area which had deteriorated and was "no longer an important shopping center"; and that Journal Square had become the most "highly concentrated" shopping area in the city and was growing as such. He pointed out that parking facilities at the Square for private cars were grossly inadequate; that all important areas other than the Ocean Avenue section of Greenville had direct single-fare bus transportation to the Square; and that he and other members of his association had received numerous complaints from the Ocean Avenue section of Greenville which he described as "one of the oldest and most densely populated sections of the City." Numerous persons who reside or have their places of business in the Ocean Avenue section of Greenville testified as to the need for the new line proposed by the Greenville Bus Company. Many of them now use the existing lines along Ocean Avenue but they stressed the resulting inconvenience, including transfer at the Communipaw Avenue Junction and the payment of double fares. Many of them testified that the transfer at the Junction was hazardous and that if they wanted to avoid it they were obliged to walk to Garfield Avenue or to Jackson Avenue or beyond to Bergen Avenue. They referred to the Garfield Avenue service as undependable and described long waits for buses; and they complained about the grades being too steep, particularly on the return walks from Garfield Avenue to Ocean Avenue. Some witnesses testified that they were afraid to walk between Ocean Avenue and Jackson Avenue in sections where assaults and

purse snatchings had been known to occur. Substantially all of the public witnesses testified that the proposed new line would furnish a needed direct single-fare service from the Ocean Avenue section of Greenville to the Medical Center and Journal Square. In addition, there was testimony that it would serve the transportation needs of Greenville residents who use public swimming pool and skating rink facilities located at the northerly end of Bayonne.

Mr. Massoth, a qualified transportation and traffic consultant, testified at length in support of the proposed new line. He was thoroughly familiar with the areas involved, had made traffic surveys, and had prepared pertinent exhibits. He testified that the new line was needed, would not be prejudicially competitive with existing lines, and that the public benefits it would confer would outweigh disadvantages resulting from any loss of traffic on the existing lines. He confirmed testimony by the public witnesses that the change at the Junction was hazardous, that the service on the Garfield Avenue line was irregular and some of the grades between Ocean Avenue and Garfield Avenue were steep, and that some sections between Ocean and Jackson Avenues were so run down that he would not "like to walk through after dark." He pointed out that the Grove Street shopping area had dwindled as the Journal Square shopping area had grown, that there were sufficient people in the Ocean Avenue section of Greenville to warrant direct bus service, and that although there was direct interstate service to New York City along Ocean Avenue there was no such service to Journal Square or the Medical Center. He expressed the belief that the "greater portion of the traffic" that would use the new line would be traffic that is now using the Ocean Avenue lines operated by the Public Service Coordinated Transport and the Greenville Bus Company and its individual stockholders. His view was that the direct service afforded by the new line would attract passengers in greater aggregate numbers and would also attract passengers who now do their shopping in New York City, traveling

on the Ocean Avenue interstate bus line. He stated that if the Garfield Avenue line gave better service it would probably carry more passengers and operate profitably along with the proposed new line. He did not consider that the proposed new line "would be competitive to any great extent with the service of the Garfield Avenue bus line" which was "generally over one thousand feet away," and he referred to the fact that when the Garfield Avenue line was originally established it was approved by the board without any local restrictions, apparently on the ground that it was not competitive with the existing Ocean Avenue lines.

Mr. Massoth described the stockholders of Greenville Bus Company as experienced and competent bus operators. They have been operating their buses along Ocean Avenue for many years and the record contains no suggestion that they have not rendered effective service to the public. In 1951 the Greenville Bus Company borrowed $30,000 on promissory notes endorsed by its stockholders and during the following year the sum borrowed by the company was repaid. Although the company owns buses which are apparently available and not in use, it plans to purchase six new buses to be used on the new line. Mr. Smith, who has been in the employ of the Greenville Bus Company as manager for many years, testified that there will be no difficulty in financing the purchase of the new buses and that the stockholders were prepared as theretofore to endorse the necessary obligations of the company.

The main testimony in opposition to the proposed new line came from Mr. Cone, a qualified traffic engineer employed by the Public Service Coordinated Transport. He expressed the view that the new line was not necessary and proper for the public convenience and that its establishment would prejudicially affect the existing bus lines, including the Ocean Avenue and Jackson Avenue lines operated by his company. He differed with Mr. Massoth's view that the new line would attract substantial numbers of additional passenger trips along Ocean Avenue; in Mr. Cone's view there would be at

most only a 5% increase. He considered that the transfer at the Communipaw Junction was not hazardous and that the shopping facilities at Grove Street and Newark Avenue were adequate. He submitted various charts based on his calculations as to the total number of passenger trips which the new line would require to operate profitably and his assumption that 95% of them would be diverted from the existing lines in stated proportions. His charts embodied his assumption that the passengers would be drawn in equal amounts from the Bergen and Jackson Avenue lines, although he acknowledged that for the most part the Jackson Avenue line was nearer to the proposed new line than was the Bergen Avenue line. He admitted that Ocean Avenue is one of the main traffic arteries in Jersey City but expressed the view that it was adequately serviced by existing lines. He disputed the testimony of some of the public witnesses that there were long waits for buses along the Jackson Avenue line operated by his company, and submitted reports of traffic checks. He also submitted a chart which disclosed that in recent years there has been a decrease in the number of passengers carried on the existing lines; apparently this has in significant part been due to a fare increase which has enabled the general maintenance of revenues. The board described Mr. Cone's testimony as being based on assumptions and mathematical calculation on these and as having less probative force than the testimony of the public witnesses who appeared in support of the application. It is to be noted that the Public Service Coordinated Transport has not made any attack on the board's determination although the appellants, Bergen Avenue Bus Owners and Central Avenue Bus Owners, as operators of the Bergen and Garfield Avenue lines, have placed reliance on Mr. Cone's testimony in support of their independent appeal.

Mr. Judge, a transport consultant, testified on behalf of the appellants. He expressed the view that the proposed new line was not needed since the area was being adequately serviced by existing lines, particularly the Garfield Avenue

line. He disputed the accuracy of Massoth's Garfield Avenue traffic check, resting his testimony on records kept by the dispatchers at the terminal of the Garfield line; it appeared, however, that the dispatch records were simply proposed schedules prepared in advance. The board stated that erasures and corrections on the dispatch records were never satisfactorily explained to it and concluded that the testimony of the witness designed to establish the regularity of the Garfield Avenue service had failed of its objective.

■ In the light of the board's decision and the supporting evidence in the record, we find little difficulty in rejecting the appellants' contention that the existing service was adequate and no need for additional service was shown. Presumably the present Ocean Avenue lines were sufficient to satisfy the public needs when the Grove Street and Newark Avenue shopping center was in its prime. But that has been replaced by Journal Square as the city's most important business, entertainment and transportation center, and residents of the Ocean Avenue section in Greenville seek direct bus carriage to its stores, theatres, tube station, interchanges and other adjuncts, as well as to the Jersey City Medical Center. As things now are they are subject to the burdens of transfer and double fare unless they are willing to travel to the Garfield line or perhaps to the Jackson Avenue line or beyond to the Bergen Avenue line; and the evidence amply established that such travel entails significant inconveniences. The testimony credited by the board leaves little room for doubt that there is substantial and justifiable public demand for direct single-fare bus service to the Medical Center and Journal Square via Ocean Avenue and that the proposed new line is suitably designed to satisfy that demand; the more troublesome question is whether the establishment of the new line will substantially prejudice existing lines with consequential adverse effects on the traveling public.

■ The appellants contend that the new line's revenues must come from them and the Public Service Coordinated Transport and that the applicant has not made any showing

of ability to operate without impairing present services. Some effect on the existing lines may be assumed but that in itself does not preclude the creation of additional facilities required by the public. The paramount consideration is the public interest, and any incidental disadvantages are simply entitled to be weighed in the balance against the ultimate public advantages. Mr. Massoth's testimony which was credited by the board was to the effect that there would be a substantial increase in the aggregate number of passenger trips and that the existing lines should be able to operate profitably along with the new line. The board rejected Mr. Cone's testimony to the contrary and we are not at liberty to deny its power to do so. The two lines now operating along Ocean Avenue and the line operating along Jackson Avenue make no assertion before this court that they will be prejudicially affected by the granting of the application to operate the new line on Ocean Avenue; one of the Ocean Avenue lines is operated by the stockholders of the applicant who affirmatively approve the granting of the application; the other Ocean Avenue line, as well as the Jackson Avenue line, is operated by the Public Service Coordinated Transport which is not attacking the board's decision approving the application. The appellants who operate the Bergen Avenue and Garfield Avenue lines do assert that they will be prejudicially affected but, in the light of the record, we accept the board's determination that no such showing was made by them. The Bergen Avenue line is, for the most part, not competitively situated; its own statement is that it is competitive for 14% of the route. The Bergen Avenue line has been giving effective transportation and it may be doubted that any significant number of passengers will be diverted from its route—certainly not enough to impair its stability and service. There is more basis for anticipating that passengers will be diverted to the new line from the Garfield Avenue line although, here again, there seems to be no reason for rejecting Mr. Massoth's testimony that if the Garfield Avenue line is run with reasonable regularity it should be able to operate

profitably along with the new line. When the Garfield line was originally established, its route was apparently considered by the board as noncompetitive to the existing Ocean lines and, under the evidence, its direct service to Journal Square has been far from satisfactory; it would hardly seem to be in any just position to complain about the ensuing public demands for and approval of additional service via Ocean Avenue. *Cf. Davidson Transfer & Storage Co. v. United States*, 42 *F. Supp.* 215, 219 (*D. C. Pa.* 1942), affirmed 317 *U. S.* 587, 63 *S. Ct.* 31, 87 *L. Ed.* 481 (1942); *Atlantic City R. R. Co. v. Board of Public Utility Com'rs.*, 8 *N. J. Misc.* 212, 214 (*Sup. Ct.* 1930), affirmed 109 *N. J. L.* 260 (*E. & A.* 1932).

It is true that at this stage no one can tell with certitude what the precise effect on the Garfield or other existing lines will be. However, the board was satisfied that the public interest required the granting of the application and that there was no showing of substantial prejudice to existing lines through additional competition. The board has been specifically charged by the Legislature with the important public responsibility of making factual and policy determinations of this particular sort and there is nothing in the record which persuades us that we should not defer to its expert judgment in the premises. See *Fornarotto v. Board of Public Utility Com'rs.*, 105 *N. J. L.* 28, 33 (*Sup. Ct.* 1928), where the court, after referring to the fact-finding functions delegated to the board, appropriately said:

"To this must be superadded under the plain provisions of this act the question of public expediency, whether under all the facts in the case the franchise is necessary and proper in view of 'the public convenience, and properly conserves the public interests.' This manifestly is a question of good judgment for the board to determine upon the evidence, as well as upon their knowledge of the situation presented by the existing conditions of public travel, and the general public welfare. The Legislature has seen fit to delegate this power to the discretion of this board, and, unless it appears that the board has reached its conclusion by a manifest violation of the law or by a clear abuse of the discretion vested in it, it is not within the power of this court to disturb the conclusion thus reached, where there is evidence apparent upon which it can be reasonably supported."

Although the appellants contend that the applicant's financial ability to operate successfully was not established, there is sufficient evidence to the contrary. Mr. Massoth testified that the available passengers in the Greenville section should support the successful operation of the new line along with the existing lines. And although he recognized that the applicant's capital assets are limited, he and other witnesses left little doubt that it will be able to meet obligations. Its stockholders are individual bus operators who have been furnishing efficient service along Ocean Avenue for many years. They have in the past furnished financial support to the applicant and have indicated that they will continue to do so in the future. The statute does not require that the board make any independent determination with respect to the applicant's financial condition, although that is one of the many relevant elements which guide the board's ultimate determination as to whether the granting of the application "is necessary and proper for the public convenience and properly conserves the public interests." *R. S.* 48:2-14. Considering all of the circumstances, including the record of past performance by the applicant and its individual stockholders, there would seem to be no substantial basis for presently questioning the financial ability of the applicant to initiate and conduct its proposed operation with proper equipment and in suitable manner.

The appellants contend that any interference with the property rights in their existing routes would violate the due process clause and they cite *Hunter v. Board of Public Utility Com'rs.*, 1 *N. J. Misc.* 408 (*Sup. Ct.* 1923) and *Pennsylvania-Reading S. S. Lines v. Board of Public Utility Com'rs.*, 5 *N. J.* 114 (1950). Neither of these decisions contains anything which questions the well recognized power of the board to approve such additional transportation services as are necessary and proper for the public convenience and to protect the public interest. *Cf. In re New Jersey & New York R. Co.*, 12 *N. J.* 281, 286 (1953). The incidental adverse effects on operators of the existing

services may readily be justified by the significant furtherance of the paramount public interest and they in nowise constitute any unconstitutional deprivation of properety. See *N. J. Power & Light Co. v. Borough of Butler, supra; Atlantic City R. R. Co. v. Board of Public Utility Com'rs., supra; Eastern N. J. Power Co. v. Board of Public Utility Com'rs.,* 6 *N. J. Misc.* 118 (*Sup. Ct.* 1928). *Cf. Tennessee Electric Power Co. v. Tennessee Valley Authority,* 306 *U. S.* 118, 139, 59 *S. Ct.* 366, 83 *L. Ed.* 543, 550 (1939).

The final contention advanced by the appellants is that the board failed to make necessary basic and ultimate factual findings. See *Delaware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 425 (1952). In *Pennsylvania Railroad Co. v. Dep't. of Public Utilities, supra,* we had occasion to cite numerous instances in which this court has stressed the importance of such findings not only in insuring a responsible and just determination by the board but also in furnishing a proper basis for the judicial review which is afforded by statute and rules. See *Abbotts Dairies, Inc. v. Armstrong, supra; Household Finance Corp. v. Gaffney,* 11 *N. J.* 576 (1953) ; *Central R. Co. of N. J. v. Department of Public Utilities,* 7 *N. J.* 247, 261 (1951) ; *Id.,* 10 *N. J.* 255 (1952) ; *Delaware, L. & W. R. Co. v. City of Hoboken, supra; New Jersey Bell Telephone Co. v. Communications Workers, etc., supra; Pennsylvania R. R. Co. v. New Jersey State Aviation Comm.,* 2 *N. J.* 64 (1949). *Cf. Weston v. N. J. State Board of Optometrists,* 32 *N. J. Super.* 502, 507 (*App. Div.* 1954) ; *New Jersey State Board of Optometrists v. Nemitz,* 21 *N. J. Super.* 18, 32 (*App. Div.* 1952). See also *Mackler v. Board of Education of City of Camden,* 16 *N. J.* 362, 370 (1954) :

"The two chief reasons for requiring findings of fact are that the case shall be decided according to evidence rather than arbitrarily, and so that the parties and reviewing authorities may determine whether it has been. *New Jersey State Bd. of Optometrists v. Nemitz, supra; Saginaw Broadcasting Co. v. F. C. C.,* 68 *App. D. C.* 282, 96 *F.* 2d 554 (*C. A. D. C.* 1938), *certiorari* denied *Gross v. Saginaw Broadcasting Co.,* 305 *U. S.* 613, 59 *S. Ct.* 72, 83 *L. Ed.* 391 (1938). See *New Jersey Bell Telephone Co. v. Communications*

*Workers, etc.,* 5 *N. J.* 354, 377 (1950); *Delaware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 425 (1952) and *Atlantic City Transp. Co. v. Director, Div. of Taxation,* 12 *N. J.* 130, 139 (1953); *Davis, Administrative Law* 527 (1951). As pointed out by Davis, *supra,* 529, there are three other practical reasons for making findings of fact: to prevent judicial usurpation of administrative functions, to help parties plan their cases for rehearing and for judicial review, and to keep administrative agencies within their jurisdiction."

In the light of the foregoing the board might well have set forth in greater detail the basic factual determinations upon which its ultimate conclusions rested. Nevertheless, its formal decision did clearly summarize testimony supporting the application, describe and reject testimony in opposition, and find: (1) that public convenience and necessity required the additional service; (2) that there was no showing that additional substantial competition to existing services would result, and (3) that operation of six of the ten buses as authorized by the municipal consent was necessary for the public convenience and that said consent properly protects the public interest. The controlling issues presented and the board's views thereon were not left in any doubt, and our full study of the record has convinced us that the evidence was wholly adequate to sustain the findings which conform with the statutory standard. See *R. S.* 48:2–14. The appellants have not shown any prejudice to themselves resulting from the limited nature of the findings (see *Pennsylvania Railroad Co. v. Department of Public Utilities, supra),* and it seems to us that the vital interests underlying the sound administration of all justice would be disserved rather than advanced by remanding the proceedings which have already been prolonged. The original application by the Greenville Bus Company was submitted early in 1952 and the final decision was rendered in June 1954. The many administrative hearings were held weeks and even months apart and they were sometimes devoted to extensive and repetitious or undisputed oral testimony which might well have been reduced by advance stipulations entered into under board guidance. A major reason for the tremendous growth of the

administrative process was the belief that the judicial process was unduly rigid, slow and expensive. Since the adoption of our Constitution of 1947 our courts have done much towards the elimination of the grounds underlying this belief. The procedures in the instant matter would no longer be tolerated in our courts and it seems ironic that far-reaching administrative agencies continue to follow them. See *Abbotts Dairies, Inc. v. Armstrong, supra,* 14 *N. J.* at *page* 332.

The absence of more detailed findings has not harmed the appellants and should not be permitted to defer the court's just and final disposition of the matter. We and the interested parties know fully the meaning of the board's decision and the evidence adequately supports it. Compare Cardozo, J. in *United States v. Chicago, M., St. P. & P. R. Co.,* 294 *U. S.* 499, 511, 55 *S. Ct.* 462, 79 *L. Ed.* 1023, 1032 (1935). Under the circumstances the findings may fairly be considered sufficient to withstand attack on this appeal. See *Atlantic City Trans. Co. v. Director, Div. of Taxation, supra,* 12 *N. J.* at *pages* 139–141; *In re Central Railroad Co. of N. J., supra,* 27 *N. J. Super.* at *page* 39. *Cf. Pennsylvania Railroad Co. v. Department of Public Utilities, supra,* 14 *N. J.* at *pages* 427, 428.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.