694 A.2d 609

MAURA LEAHEY, PLAINTIFF, v. SINGER
SEWING COMPANY, DEFENDANT.

Superior Court of New Jersey
Law Division
Monmouth County

Decided December 4, 1996.

---

[7] The divorce complaint between these parties was filed about four months after the domestic violence trial.

*Wesley M. Kain* (*Lawrence, Leslie & Kain*) for Plaintiff.

*John M. Nolan* (*Jackson, Lewis, Schnitzler & Krupman*) for Defendant.

D'AMICO, J.S.C.

This matter comes before the court on a motion by defendant for summary judgment. Plaintiff has filed a complaint against

defendant alleging unlawful discharge from employment. Count One of the complaint alleges that plaintiff was wrongfully terminated while on leave pursuant to the New Jersey Family Leave Act, *N.J.S.A.* 34:11B–1 through –16 (FLA). Count Two alleges sex discrimination in violation of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1, through –42 (LAD).

Count Three alleges that by virtue of a handbook prepared by defendant Singer Sewing Company (Singer), plaintiff had an employment agreement which was breached when she was terminated without "just and sufficient cause." Count Four alleges that Singer did not give plaintiff any warning before her discharge, did not give her an opportunity to rehabilitate her position, did not discuss her job performance with her, and otherwise violated company discharge procedures.

Plaintiff Maura Leahey was hired by defendant Singer on May 16, 1988, as an Accounts Receivable Supervisor in Singer's North American Sewing Products Division. She was directly responsible for all credit and collection of special market accounts and fabric chain accounts, including the TransAmerica accounts. Her duties and responsibilities included the establishment of credit limits, the opening of accounts, the tracking of receivable arrears, and the handling of cash receipts. Plaintiff worked very closely with the Accounting and Finance Departments and with outside auditors. She also was the representative or liaison of her department to the systems department. There were three persons who reported to plaintiff and who were trained by her.

Plaintiff was an at-will employee, having not received or signed an employment contract with Singer. On or about January 12, 1994, plaintiff took a disability leave of absence as a result of her pregnancy. Thereafter, she extended her leave pursuant to the FLA, her anticipated date of return being May 23, 1994. At the time plaintiff went out on leave, she was involved in developing certain programs for a new computer system called an "AS400" which Singer had purchased. Plaintiff's responsibilities were assumed by Rosemary DeCarlo, who had previously been responsi-

ble for "dealer" accounts. "Dealer" accounts were generally smaller and produced less revenue than the "special market" accounts handled by plaintiff, which involved large retail chains. Several of these "special market" accounts were assigned to Ms. DeCarlo.

During the period of plaintiff's employment, Singer asserts that it experienced financial difficulties and reduced its employee work force in an effort to streamline its organization. According to Peter Diskin, Vice–President of Finance of Singer, he was advised in April, 1994, that another "reduction-in force" would be required. Mr. Diskin decided to eliminate a position in the Finance Department and to consolidate the positions of Accounts Receivable Supervisor and Credit and Collections Supervisor. Mr. Diskin stated: "[U]ltimately, it came down to a decision as to whether I should eliminate the plaintiff's position and assign her responsibilities to Ms. DeCarlo, or eliminate Ms. DeCarlo's position and assign her responsibilities to the plaintiff."

Mr. G.L. Gillespie, Manager of the General Accounting and Credit Department, issued a memorandum on April 19, 1994, entitled "Reporting Change—Accounts Payable." It stated that "in line with our continuing efforts to streamline the Finance Area, ... Maura Leahey's position has been eliminated immediately ... and Rosemary DeCarlo will now assume the overall responsibility of the Credit Department." One other position, that of Janice Kobesto, was also eliminated. Two males were retained, the first being Jim Dermody, whose duties and responsibilities, according to Mr. Diskin, were "quite different from those of the plaintiff and Mrs. DeCarlo." The second was Trevor Tormann, who took on additional responsibilities. Two other females were also retained: Imrana Wahidy and Audrey Martucci.

Mr. Diskin states that he made a business decision "based on what I thought was in the best interests of Singer"—specifically, that since January, 1994, Ms. DeCarlo had assumed many of the responsibilities of plaintiff; that Ms. DeCarlo had spent a considerable amount of time developing the program specifications for

the AS400 and was very familiar with the system; and that the manner in which the "special market" and "dealer" accounts were handled once the AS400 became operational was quite different from the manner in which the accounts were handled by plaintiff before January, 1994. In addition, Diskin states that the decision was based on the fact that before she joined Singer in 1991, Ms. DeCarlo had experience with bankruptcy matters and collection, eight years of experience in credit and collections, and approximately 15 years of accounting experience.

Plaintiff asserts that at the time she was terminated, her seniority, duties, training, responsibilities, knowledge and experience far exceeded that of Rosemary DeCarlo. Plaintiff contends that she was well-versed in the development and use of programs for the AS400 computer system and that she worked on various systems which were similar to the ones installed at Singer. Plaintiff also contends that the salary earned by her was less than that earned by Rosemary DeCarlo. Plaintiff argues that her termination was due solely to discrimination based upon her sex and her ability to bear children. She asserts that she was discharged while two males were retained. Plaintiff also contends that she was the only woman in the affected departments who was capable of bearing children and who was on leave pursuant to the FLA at the time of the reduction in force; whereas, the person who replaced her, Ms. DeCarlo, was unmarried, forty years of age, and had no children.

In support of its motion for summary judgment, Singer contends that plaintiff's claim that she was wrongfully terminated while on leave pursuant to the FLA must fail as a matter of law. Singer argues that under the FLA, eligible employees are entitled to a leave of absence for up to twelve weeks in order "to provide care made necessary by reason of" either: (1) the birth or placement for adoption of a child; or (2) the serious health conditions of a child, parent or spouse. *N.J.S.A.* 34:11B–3(i), –4. The FLA further provides as follows:

An employee who exercises the right to family leave under section 4 of this act shall, upon the expiration of the leave, be entitled to be restored by the employer to the position held by the employee when the leave commenced or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment. If during a leave provided by this act, the employer experiences a reduction in force or layoff and the employee would have lost his position had the employee not been on leave, as a result of the reduction in force or pursuant to the good faith operation of a bona fide layoff and recall system including a system under a collective bargaining agreement where applicable, the employee shall not be entitled to reinstatement to the former or an equivalent position. The employee shall retain all rights under any applicable layoff and recall system, including a system under a collective bargaining agreement, as if the employee had not taken the leave.

[*N.J.S.A.* 34:11B–7.]

The term "reduction in force" is not defined in the FLA. There are to date no reported New Jersey decisions involving an alleged violation of the FLA and/or the LAD in the context of a reduction in force. This issue has been considered by the United States Court of Appeals, Third Circuit, however, in the case of *Marzano v. Computer Science Corp., Inc.,* 91 *F.*3d 497 (3d Cir.1996). In that case a female former employee brought an action in the Superior Court against a former employer alleging unlawful discrimination on the basis of pregnancy in violation of the New Jersey LAD, unlawful interference with her rights under the New Jersey FLA, and breach of an implied in-fact employment contract. The case was removed to Federal Court.

Marzano alleged that she was hired by Computer Science Corp. in September, 1990; that she went on maternity leave in July, 1993; that she gave birth to her son the next month; and that she was laid off on October 5, 1993. Her performance was satisfactory or better throughout her tenure, and she had been promoted. The defendant alleged that Marzano's position was eliminated along with nine others out of some fifty positions in her unit after financial conditions worsened.

Marzano claimed that the defendant violated her right under the FLA to be restored to her previous position or to an equivalent position of like seniority, status, employment benefits, pay and other terms and conditions of employment. *N.J.S.A.* 34:11B–7.

She further argued that the exception permitting termination of someone on leave when the employer experiences a reduction in force did not apply because the defendant's claim of financial distress, which was the stated reason for the alleged forced reduction, was false.

The Circuit Court of Appeals reversed the District Court's action granting a motion for summary judgment for the former employer, holding that there was a genuine question of fact regarding whether or not Marzano's employer experienced a reduction in force. There was some doubt as to the validity of the financial statements of Marzano's unit and whether that unit was, in fact, independent of AT & T, in which case the unit of which she was a part could not have been in financial distress. The Circuit Court of Appeals stated that a factfinder could conclude that no valid and true reduction in force occurred in the unit since it had no independent existence of its own; therefore, whether a reduction in force did occur was a question of fact that should have been presented to a jury. *Id.* at 505–506.

The Circuit Court of Appeals observed that what makes an employer's personnel action unlawful discrimination is the intent behind that action. It is extremely difficult, if not impossible, to establish directly the motivation of one's employer, or that of any party. *See U.S. Postal Service Board of Governors v. Aikens*, 460 *U.S.* 711, 715–716, 103 *S.Ct.* 1478, 1482, 75 *L.Ed.*2d 403 (1983). Direct proof of discrimination is generally not required because it is often unavailable or difficult to find, there usually being no written records revealing the forbidden motive. As a result, most employment discrimination lawsuits seek to prove intent through inference. *Marzano v. Computer Science Corp., Inc., supra.,* at 507.

The Circuit Court of Appeals stated:

In the typical case, the plaintiff attempts to establish the employer's motivation by a process of elimination. In other words, because plaintiffs generally cannot present evidence affirmatively pointing to their employer's actual reason for taking certain action against them, they must instead try to show that no reason other than discrimination is plausible, and that accordingly discrimination must have

been the reason. To enable a jury to reach this conclusion, plaintiffs must establish three elements: (1) that their employer took an adverse employment action against them; (2) that the facts of the case are compatible with discrimination being the reason; (3) that the employer is unable to provide an alternative nondiscriminatory reason for the action, or that its stated reason is false. Since there must be some reason for the employer's action and since no reason other than discrimination has been shown to be plausible, this scheme allows a jury to infer that discrimination must be the reason.

The burden-shifting analysis enunciated by the Supreme Court in *McDonnell Douglas* [*Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973)] and developed and refined in subsequent judicial forays into the subject is designed to ensure that plaintiff has enough evidence to construct the chain of inferences described in the previous paragraph, and therefore get to trial. In the first instance, the plaintiff must establish a prima facie case. The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action.... Jumping over this first hurdle, however, has important consequences. By meeting his or her prima facie burden, the plaintiff earns the right, as in a poker game, to require the employer to show its hand—that is, to offer an explanation other than discrimination why the employee suffered an adverse employment action. It is as if plaintiff told the employer, "I cannot get into your mind to prove with certainty that you acted against me based on a discriminatory motive. You, on the other hand, know the reason why you acted against me. I have done the best I can, which is to show that discrimination could have been the motive. Therefore, it is your turn to prove me wrong by articulating the nondiscriminatory reason for your action." If the employer is unable to proffer a nondiscriminatory reason, plaintiff is entitled to summary judgment or judgment as a matter of law, as the case may be; if the employer proffers a reason and the plaintiff can produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury.

[*Marzano, supra*, at 507.]

The Court of Appeals held in *Marzano* that in the context of a reduction in force, the standard is as follows: To demonstrate a *prima facie* case in reduction in-force cases, "the plaintiff must show that he [she] was in the protected class, he [she] was qualified, he [she] was laid off, and other unprotected workers were retained." *Id.* at 506; *Armbruster v. Unisys Corp.*, 32 *F.*3d 768, 777 (3d Cir.1994); *Di Biase v. Smith–Kline Beecham Corp.*, 48 *F.*3d 719, 723 n. 2 (3d Cir.1995). The Circuit Court of Appeals predicts that New Jersey would adopt this standard because it satisfactorily protects the interests of employer and employee.

The New Jersey Supreme Court has adopted the methodology of *McDonnell Douglas Corporation v. Green, supra,* and commended it to our trial courts as a starting point in actions brought under the LAD. *Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55, 81–84, 389 *A.2d* 465 (1978); *Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* 19, 31–34, 429 *A.2d* 341 (1981). The Appellate Division has also followed an approach similar to that recommended by the Circuit Court of Appeals in *Marzano,* holding that: (1) establishment of the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee; (2) the burden that shifts to defendant is to rebut the presumption of discrimination by producing evidence that plaintiff was terminated for a legitimate, nondiscriminatory reason, (3) plaintiff's *prima facie* evidence and inferences therefrom may be considered by the jury on the issue of whether defendant's explanation is pretextual, and (4) in carrying her ultimate burden of persuading the jury that she has been the victim of intentional discrimination, plaintiff may succeed either directly by persuading the jury that a discriminatory reason or purpose was "a determinative factor" in her termination or indirectly by showing that the employer's proffered explanation for the termination is unworthy of credence. *Slohoda v. United Parcel Service,* 207 *N.J.Super.* 145, 154–155, 504 *A.2d* 53 (App.Div.1986); *Romano v. Brown and Williamson Tobacco,* 284 *N.J.Super.* 543, 665 *A.2d* 1139 (App.Div. 1995) (Similar standards applied in a suit asserting retaliatory discharge under the LAD. Note that this court rejects Singer's contention that plaintiff must show that her layoff was in retaliation against her for taking leave under the FLA, there being no allegation of a violation of *N.J.S.A.* 34:11B–9b or c.)

This court finds that the standard set forth in *Marzano v. Computer Corp., Inc., supra,* at 506, is a reasonable and logical application of this analysis to a reduction in force situation; therefore, it will be applied in this case. The fact that plaintiff was laid off while on family leave establishes that she suffered an adverse employment action. Giving plaintiff the benefit of all

favorable inferences, her assertion that she was qualified and that two males and two females not on family leave were retained and that she was replaced by an unmarried childless female worker establishes that plaintiff was treated differently from her colleagues and introduces a question: Why? In other words, it raises the question of what is distinctive about plaintiff that caused the employer to treat her differently from her colleague. The fact that plaintiff was on family leave as a result of childbirth identifies one possible answer. It is one condition in which she differs from her colleague who was retained. It does not necessarily demonstrate that her on-leave status is the reason why she was treated differently; but it makes it a plausible explanation that is compatible with the facts of the case. *See Marzano v. Computer Science Corp., Inc., supra,* at 508–509.

At this point, the burden switches to the employer, who must state the nondiscriminatory reason for treating plaintiff differently from those unprotected employees who were retained. *Marzano, supra,* at 509. In this case, Singer asserts that it suffered from financial difficulties which not only warranted, but mandated, a reduction in force. Singer further argues that unlike the plaintiff in *Marzano,* plaintiff has done nothing to cast doubt on the validity of Singer's work force reduction. On the contrary, Singer contends that plaintiff has acknowledged the necessity of a work force reduction and is only disputing the fact that she, not Ms. DeCarlo, lost her job.

Plaintiff contends that the sole reason for her termination was that she had just become a mother, and Singer feared that this fact would affect her job performance. Plaintiff argues that if Singer truly terminated her due to streamlining and cost reduction, then it would have made more sense to retain her in lieu of Ms. DeCarlo because although plaintiff had more seniority and experience, she was earning less money than Ms. DeCarlo. Thus, plaintiff asserts that Singer's excuse based on reduction in force is merely a pretext for discrimination against her in violation of her rights under the FLA and the LAD.

■ I find that plaintiff has produced sufficient evidence to cast doubt on defendant's stated reason for her termination. The question therefore becomes: was the reduction in force undertaken and implemented in good faith or as a pretext for (1) an adverse employment action against plaintiff contrary to section 11B-7 of the FLA and (2) discrimination on the basis of sex in violation of the LAD. Simply "by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." *Marzano, supra,* at 509–510; *Slohoda v. United Parcel Service, supra,* at 154, 156, 504 *A.*2d 53 (The net effect of an articulated legitimate, nondiscriminatory explanation is to create a question of fact for the jury as to the reason for plaintiff's discharge). Defendant's motion to dismiss Counts One and Two of the plaintiff's complaint is therefore denied.

■ Among the factors to which the federal courts have referred and which it would be appropriate for the jury to consider in determining whether or not Singer terminated plaintiff as a result of a "good faith" reduction in force are the following:

1.   Whether the business reasons for the reduction in force and the anticipated economic savings therefrom were adequately documented. *Tice v. Lampert Yards, Inc.,* 761 *F.*2d 1210 (7th Cir. 1985); *Marzano, supra,* at 503–506.

2.   The number of employees or percentage of the company's work force affected by the reduction in force. *Oxman v. WLS-TV,* 846 *F.*2d 448, 457 (7th Cir.1988) (Plaintiff was the only qualified newsroom employee terminated because of reorganization.)

3.   The existence of adequately documented selection criteria and procedures for implementation of the reduction in force. *Brito v. Zia Co.,* 478 *F.*2d 1200 (10th Cir.1973); *Stendebach v. CPC International, Inc.,* 691 *F.*2d 735 (5th Cir.1982).

4.   Whether reduction in force decisions were made on the basis of objective job related selection criteria and procedures or

by reference to the individuals occupying the affected positions. *Christie v. Foremost Ins. Co.*, 785 *F*.2d 584 (7th Cir.1986). (Discrimination inferred from evidence that employer did not follow its reduction in force policy and that the manager deciding on the layoff was unaware of the policy).

5. Whether reduction in force decisions were based on fair and objective performance evaluations of the affected employees. *Duffy v. Wheeling Pittsburgh Steel Corp.* 738 *F*.2d 1393 (3rd Cir.1984).

6. Whether there was any consideration of alternatives to laying off employees to achieve the economic savings anticipated from the reduction in force, such as shortened work weeks or work days, temporary shutdowns, voluntary reverse seniority layoffs with partial pay, work-sharing, reductions in authorized overtime, salary freezes or reductions, hiring freezes and/or early retirement incentive programs. *Jacobson v. Pitman–Moore, Inc.*, 582 *F.Supp.* 169 (D.Minn.1984); *Gelof v. Papineau,* 648 *F.Supp.* 912 (D.Del.1986).

If the jury finds that there are sufficient facts related to these factors—that is, that Singer did not adequately document its business reasons for, and anticipated economic savings from, the reduction in force; that the number or percentage of employees affected was too small to constitute a *bona fide* reduction in force; that selection criteria and procedures were insufficiently documented; that Singer made reduction in force decisions with reference to the individuals occupying the affected positions, rather than on the basis of objective job-related selection criteria; that Singer did not make reduction in force decisions based on performance evaluations; and/or that Singer did not consider alternatives to laying off the affected employees to achieve the financial goals of the reduction in force—to support by a preponderance of the evidence the conclusion that the reduction in force was not implemented in good faith, then Singer can be found to have violated Section 11B–7 of the FLA; and the jury may determine damages pursuant to Section 11B–11. The jury may also deter-

mine if defendant committed an unlawful employment practice or an unlawful discrimination under the LAD by discharging plaintiff. On the other hand, if the jury determines based on a review of the factors that the reduction in force was undertaken in good faith, then no violation of the FLA or LAD will have occurred.

This court rejects Singer's contention that Plaintiff is not a member of a protected class under the LAD. The LAD provides that individuals must be provided the opportunity to secure employment "without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex." *N.J.S.A.* 10:5–4. The LAD further declares unlawful any employment decision which discriminates on the basis of "race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex, or atypical heredity cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual...." *N.J.S.A.* 10:5–12.

While it may be true, as Singer argues, that the Legislature has not expressly expanded the LAD to include employees who exercise their rights under the FLA, discrimination against women by reason of pregnancy violates the LAD. *Castellano v. Linden Board of Education*, 158 *N.J.Super.* 350, 386 *A.2d* 396 (App.Div.1978), *rev'd on other grounds, aff'd in part*, 79 *N.J.* 407, 400 *A.2d* 1182 (1979); *Gilchrist v. Haddonfield Bd. of Educ.*, 155 *N.J.Super.* 358, 367–69, 382 *A.2d* 946 (App.Div.1978); *Farley v. Ocean Bd. of Educ.*, 174 *N.J.Super.* 449, 451–52, 416 *A.2d* 969 (App.Div.1980). Singer contends, however, that when plaintiff recovered from her pregnancy, she was no longer a member of this protected class under the LAD, notwithstanding the fact that she was on family leave pursuant to the FLA. This court disagrees. To say that a female in plaintiff's position cannot be discriminated against as a matter of law is to draw an artificial and inappropriate distinction between an absence from work during recovery from pregnancy and a legally protected leave of

absence in order to provide child care made necessary by the birth of the child.

In enacting the FLA, the Legislature made the following findings and declarations:

The Legislature finds and declares that the number of families in the State in which both parents or a single parent is employed outside the home has increased dramatically and continues to increase and that due to lack of employment policies to accommodate working parents, many individuals are forced to choose between job security and parenting.... The Legislature further finds that it is necessary to promote the economic security of families by guaranteeing jobs to wage earners who choose to take a period of leave upon the birth ... of a child.... The Legislature, therefore, declares that it is the policy of the State to protect and promote the stability and economic security of family units. The Legislature further declares that employees should be entitled to take a period of leave upon the birth ... of a child ... without risk of termination of employment, ... and without loss of certain benefits.

[*N.J.S.A.* 34:11B–2.]

The findings and declarations of the Legislature in connection with the enactment of the LAD are as follows:

The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of ... sex [or] familial status ... are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State ...

The Legislature further declares its opposition to such practices of discrimination when directed against any person by reason of ... sex ..., in order that the economic prosperity and general welfare of the inhabitants of the State may be protected and ensured.

The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

[*N.J.S.A.* 10:5–3.]

The subject matter and policies of the FLA are similar to and consistent with those recognized under the LAD. Therefore, the rule of construction that statutes which deal with the same matter or subject and seek to achieve the same overall legislative purpose should be read and construed together applies to this case. *Mimkon v. Ford*, 66 *N.J.* 426, 433–34, 332 *A.*2d 199 (1975); *County of Essex v. Waldman*, 244 *N.J.Super.* 647, 656, 583 *A.*2d 384 (App.Div.1990). There is no conflict between the LAD, which is to be construed liberally, and the FLA regarding the issues in this case. Both enactments should therefore be viewed together and harmonized. *Hinfey v. Matawan Regional Board of Education*, 147 *N.J.Super.* 201, 371 *A.*2d 78 (App.Div.1977); *D.I.A.L. v. Dept. of Community Affairs*, 254 *N.J.Super.* 426, 603 *A.*2d 967 (App.Div.1992). Plaintiff may therefore proceed under both Counts One and Two of her complaint.

As to Singer's motion to dismiss Counts Three and Four of plaintiff's complaint, it is undisputed that plaintiff had no individual contract of employment with defendant. Therefore, any claim for wrongful termination by plaintiff must be predicated on breach of a contract of employment created by the Singer Employee Handbook (Handbook).

Plaintiff alleges that pursuant to the terms and conditions of the Handbook, "just and sufficient cause" was a prerequisite to her termination (Count Three). Plaintiff also alleges that pursuant to the terms and conditions of the Handbook, Singer failed to give her the "requisite warning prior to discharge", "failed to allow [her] an opportunity to rehabilitate [her] position", "failed to discuss [her] job performance," and "otherwise violated Company policy with regard to discharge procedure" (Count Four).

■ Singer alleges that in her sworn deposition testimony, plaintiff admitted that these requirements were only applicable when an employee is terminated for performance reasons and that they were inapplicable in her case because her position was eliminated pursuant to a reduction in force, and not for performance reasons. Plaintiff is alleging that the reduction in force

was not undertaken in good faith, but rather as a pretext for her unlawful discharge. If the jury so finds, the jury must also be allowed to determine whether the Handbook created binding duties and obligations between Singer and plaintiff and whether Singer failed to accord to plaintiff the benefits conferred by the Handbook. *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 491 *A.*2d 1257 (1985); *Witkowski v. Thomas J. Lipton, Inc.,* 136 *N.J.* 385, 643 *A.*2d 546 (1994). Accordingly, Singer's motion to dismiss Counts Three and Four of plaintiff's complaint is denied.